497 So.2d 1364 (1986)
Walter Lewis GOVER and Evelyn Gover Smith
v.
Dr. Ronze McIntyre BRIDGES and St. Paul Fire and Marine Insurance Company.
No. 86-C-1006.
Supreme Court of Louisiana.
November 24, 1986.
*1365 Gary Bower, Bowers & Bowers, Francis M. Gowen, Jr., for applicant.
Brian D. Smith, Lunn, Irion, et al., for respondent.
DIXON, Chief Justice.[*]
We granted writs in this case to determine whether the defendant acted in such a manner that the doctrine of "contra non valentem" would apply to prevent the accrual of the prescriptive period of R.S. 9:5628. An exception of prescription was sustained in the trial court, and the court of appeal affirmed. Gover v. Bridges, 486 So.2d 1117 (La.App.2d Cir.1986).
Plaintiffs' claim that prescription did not accrue because of a letter of Dr. Bridges which "effectually prevented" (Corsey v. Department of Corrections, 375 So.2d 1319 (La.1979)) them from availing themselves of their cause of action for their mother's death.
On January 9, 1976 the decedent, Velma E. Gover, mother of plaintiffs, Walter Gover and Evelyn Gover Smith, was examined by defendant, Dr. Ronze McIntyre Bridges, and was found to have a lump in her left breast. Mrs. Gover was seventy-five years old, weighed over three hundred pounds and suffered from hypertension and arteriosclerotic heart disease. She was admitted to the Minden Medical Center on January 23, 1976 in order to stabilize her condition prior to surgery. Apparently Dr. Bridges' original plan was to perform a biopsy using a local anesthetic, determine whether the lump was cancerous and then take the appropriate medical action which, in the case of cancer, would be a radical mastectomy performed under general anesthesia. Mrs. Gover signed a consent form authorizing the biopsy and "such additional operations or procedures as are considered therapeutically necessary on the basis of findings during the course of the operation."
On January 26, 1976, the day of the operation, Dr. Bridges made the decision that Mrs. Gover's heart condition had stabilized enough to perform an operation under general anesthesia. In an effort to reduce the operation time and, therefore, the stress on the patient, Dr. Bridges decided to perform the biopsy under general anesthesia with a pathologist standing by to do a frozen section on the tissue. The pathologist, Dr. Michael Ellis, examined the frozen section and diagnosed it as carcinoma. Upon this determination, Dr. Bridges proceeded to do a radical mastectomy of the decedent's left breast.
Early in the operation the decedent encountered some premature heartbeats but her condition was stabilized through the use of Lidocaine. Following the operation she was removed to the recovery room for observation. Decedent's postoperative condition was considered good, and she was *1366 returned to her semiprivate room. Evelyn Gover Smith stayed at the hospital following the surgery. Late that night decedent developed heart problems. Mrs. Smith summoned help, but efforts to revive decedent were unsuccessful and she died on the night of January 26, 1976.
In a letter to the hospital dated March 10, 1976,[1] Mrs. Smith questioned whether the mastectomy was authorized by her mother since her mother had given her the impression that only a biopsy was to be performed. Mrs. Smith also wanted to know exactly what was the cause of death. This letter was answered [2] by Dr. Bridges *1367 who, writing from memory, mistakenly stated that the procedure was to be a two step operation performed under local anesthesia. Although he alluded to the fact that the entire operation was performed with the decedent under a general anesthetic, he did not specifically inform Mrs. Smith in the letter of his decision to change the operating procedure. This decision was based on Dr. Bridges' determination that the decedent's cardiac and blood pressure condition had stabilized at an acceptable level. The doctor also stated that the decedent was "completely evaluated and every precaution was made before operation to insure a successful surgical experience." Dr. Bridges also expressed his regrets and stated that "everything was done possible to prevent what happened," and in the following paragraph, that "your Mother signed authorization for the biopsy and the radical mastectomy."
No further action was taken until Mrs. Smith read an article in the March 30, 1985 addition of The Shreveport Times regarding a $1.3 million malpractice judgment rendered against Dr. Bridges in the case of Cooper v. Bridges. After reading the article, Mrs. Smith contacted the plaintiffs' attorneys in Cooper and learned that they had received a copy of Mrs. Gover's hospital chart in response to a subpoena duces tecum in the Cooper case requesting charts on all of defendant's patients who died in January, 1976. On May 30, 1985 plaintiffs filed suit against defendant and his insurer, St. Paul Fire and Marine Insurance Company.
Defendant filed an exception of prescription based on R.S. 9:5628, which provides that claims arising from medical malpractice must be brought within one year from the alleged act, omission or neglect, and in all events within three years from the date of the act, omission or neglect.
Plaintiffs argued that defendant misrepresented the facts to them in his letter, and as a result they were prevented from bringing their claim at an earlier date. To show that statements in the letter were false and misleading, plaintiffs presented the testimony of their expert, Dr. George McCormick, who is the Caddo Parish coroner and a forensic pathologist.
The trial court sustained the exception of prescription. The court found that the doctrine of contra non valentem was legislatively overruled by R.S. 9:5628 and, therefore, the claim had prescribed. The court also found that the statute was constitutional, finding a legitimate state interest in lowering health care costs by limiting the amount of time during which malpractice claims can be brought.[3]
Plaintiffs appealed to the court of appeal, 486 So.2d 1117 (La.App.2d Cir.1986), which affirmed and found that the applicable statute in a medical malpractice action for wrongful death is R.S. 9:5628. The court also upheld the trial court's determination of the statute's constitutionality. The appellate court found that it was not necessary, under the present facts, to determine whether contra non valentem applied since the plaintiffs failed to show the requisite misrepresentation to trigger the doctrine.
Article 3467 of the Louisiana Civil Code provides: "Prescription runs against all persons unless exception is established by legislation." This article is derived from Article 2251 of the French Civil Code. Each code provides for substantially the same enumerated exceptions to this general rule. Additionally, both the French and Louisiana jurisprudence recognize as a suspension of prescription the doctrine of "contra non valentem agere nulla currit praescriptio." Comment, The Scope of the Maxim Contra Non Valentem in Louisiana, 12 Tul.L.Rev. 242 (1938).
"... As a universal principle, of equal weight to the law of prescription itself, the doctrine was applied so extensively by the pre-revolutionary jurisprudence of France that it threatened to make of *1368 prescription the exception rather than the rule...." 12 Tul.L.Rev. at 242.
Long ago this court laid out three categories of situations in which the doctrine of contra non valentem might apply so as to prevent the running of liberative prescription: (1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) where there was some condition coupled with the proceedings which prevented the creditor from suing or acting; and (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action. Reynolds v. Batson, 11 La.Ann. 729, 730-31 (1856). In the case of Corsey v. State Department of Corrections, 375 So.2d 1319 (La.1979), this court recognized the above stated three categories and a fourth: "where the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant." 375 So.2d at 1321-22.
In Chaney v. State Department of Health & Human Resources, 432 So.2d 256 (La.1983), this court held that R.S. 9:5628 legislatively overruled the doctrine of contra non valentem described in situation number four as it applied to medical malpractice actions filed more than three years from the date of the act, omission or neglect. This court made no finding as to what effect R.S. 9:5628 has on the other three situations where contra non valentem might apply.
Plaintiffs claim that Dr. Bridges made misstatements in his letter to Mrs. Smith which should be construed as the third circumstance described in Reynolds v. Batson, supra, where the plaintiff is prevented from bringing a claim by the fraud or misrepresentation of the defendant. The courts of appeal are divided on this issue. The Fourth Circuit in Harvey v. Davis, 432 So.2d 1203 (La.App.4th Cir.1983), held that in the event of fraud by the defendant, the doctrine would operate to suspend the running of prescription. The Third Circuit, on the other hand, in Ramirez v. St. Paul Fire and Marine Insurance Company, 433 So.2d 219 (La.App.3d Cir.1983), writ denied, 441 So.2d 212 (La.1983), held that contra non valentem was simply no longer available in a medical malpractice claim because R.S. 9:5628 operates to curtail an open-ended time within which to file a medical malpractice claim.
The letter written by Dr. Bridges in response to Mrs. Smith's request for more information concerning her mother's death contains several statements which plaintiffs claim have prevented them from pursuing their cause of action. In the second paragraph defendant stated that the plan of action would be to remove the lesion under local anesthesia and have the pathologist analyze a frozen section. If he reported back that it was cancer, a radical mastectomy would be done. This procedure was in fact not followed. Both the biopsy and the mastectomy were performed under general anesthesia. In paragraph three the defendant stated that he had the decedent enter the hospital three days before the scheduled surgery to "completely evaluate" her. The letter continued that decedent was "completely evaluated and every precaution was made before operation to insure a successful surgical experience." Plaintiffs' expert, Dr. McCormick, testified that these statements were incorrect and misleading because "proper diagnostic procedures were not done to ensure that this lady was a suitable surgical candidate." He testified that additional blood gas tests should have been performed prior to surgery, as well as a stress test to determine how her heart would behave under stress.
After briefly explaining the cause of death, the defendant stated: "I regret very much this result, but I can assure you everything was done possible to prevent what happened." Both Dr. Bridges and Dr. McCormick testified that decedent should have been removed to the intensive care unit following the surgical procedure rather than to her semiprivate room. This would have constituted good medical practice and would have allowed decedent to be monitored by a nurse at all times.
In the last sentence of paragraph ten of the letter, Dr. Bridges stated: "Your Mother *1369 signed authorization for the biopsy and the radical mastectomy." Decedent's medical record clearly indicates that she signed a consent form in which the stated surgical procedure was a biopsy, not a radical mastectomy. Dr. Bridges maintains that the language "and such additional operations or procedures as are considered therapeutically necessary on the basis of findings during the course of the operation," gave him the requisite authorization.
The letter does contain misstatements of fact concerning what occurred during decedent's hospitalization. The issue is, however, whether defendant's statements in this letter prevented plaintiffs from availing themselves of their cause of action.
Both the son and daughter were surprised that Mrs. Gover underwent a mastectomy. Her son was changing employment and did not know his mother intended to enter the hospital. Mrs. Smith knew only that her mother had told her that she was to have a biopsy, but had no information about the procedures intended. She was, however, present in a waiting room and was told of the mastectomy as soon as it was performed. She was with her mother when the heart episode occurred, but did not see the doctor afterward.
Mrs. Smith's testimony was that she trusted the doctor, and his letter seemed to reassure her. She did wonder, though, about the difference between what her mother told her and what the doctor's letter said about the plan to operate. At the trial of the exception, she said she had been aware that the "I.V." was dry before her mother's heart attack, and felt that there was not enough done for her mother at that time.
What seemed to satisfy her was Dr. Bridges' assurance that everything possible was done for her.
Mrs. Smith was neither ignorant nor unintelligent. She was employed in the Veterans Administration Hospital in a clerical capacity when her mother died, and for five and one-half years thereafter.
None of the errors or misstatements in Dr. Bridges' letter "effectually prevented" a complete discovery of every fact about her mother's stay in the hospital. Her charts were available. They were never requested.
The kind of reassurance given by this doctor to the daughter of his patient does not reach the level of either fraud or breach of a duty to disclose, which prevented Mrs. Smith from learning of her cause of action. At worst, the letter was self-serving as to the quality of care given Mrs. Gover and in error about the plan for biopsy under a local anesthetic and about the signed authorization for a mastectomy.
This letter does not approach the concealment, fraud and misrepresentation, for example, alleged in Nathan v. Carter, 372 So.2d 560 (La.1979), did not prevent the timely filing of the suit, and did not have the effect of interrupting or suspending prescription.
The rulings of the courts below sustaining the exception of prescription are affirmed at relators' cost.
COLE, J., concurs.
NOTES
[*] Judge LEWIS S. DOHERTY, III, Retired, sitting in place of LEMMON, J.
[1] "March 10, 1976
Minden Sanitarium, Inc.
Minden, La.
Re Patient: Gover, Velma E
Medicare

I have received a letter from Dr. Bridges telling me there will be no further charges for my mother.
My mother really liked all of the nurses and Dr. Bridges at the hospital. I have one question that bothers me. When she was admitted to the hospital, I was under the impression that it was just for a biopsy and I believed she thought that, because we were considering a Shreveport hospital if she had to have further surgery. Did she authorize this mastectomy? Also, since I have not seen a death certificate, I don't know exactly what the cause of death was. Was it an embolism?
 Sincerely,
 s/Evelyn G. Smith
 Evelyn Gover Smith
 3203 Rose Pl
 Bossier City, La. 71010"

[2] "March 14, 1976
Mrs. Evelyn Gover Smith
3203 Rose Place
Bossier City, Louisiana 71010
Dear Mrs. Smith:

Your Mother, Velma E. Gover, was first seen by me on January 9, 1976 with a large mass in the left breast and severe hypertension, BP 200/120. She had a long history of hypertension and her Serapes medicine was not controlling. On this first visit I explained to her that the mass in her breast was probably cancer, but her high blood pressure and cardiac condition must be brought under the best possible condition before surgery could be undertaken.
She returned on January 16, 1976 and her diastolic pressure was down to 90 and her systolic initially 230. At the end of the examination her BP was 170/90. As before, I explained the plan of action would be to remove the lesion under local anesthestic and have the Pathologist do a frozen section. If he reported back that it was cancer, we would do a radical mastectomy. She completely understood the course of action from the beginning.
I insisted that she come in the hospital three days before this surgery to thoroughly evaluate her cardiac and blood pressure condition and get her in the best possible condition for surgery. She understood and wanted the benefit of surgery in an effort to render her a cure. She was hospitalized on January 23, 1976 and completely evaluated and every precaution was made before operation to insure a successful surgical experience. Her EKG was sent to Dr. Holoubek, who felt it was advisable to digitalize her to eliminate occasional premature heart beats. This was done.
Her BP was stabilized at 160/70 prior to surgery and all premature beats were eliminated with digitalis.
With the induction of anesthesia she developed an occasional premature heart beat. These were eliminated with Xylocain drip. Total surgery time was 40 minutes for the radical mastectomy and the cardiac monitor during surgery was excellent and her whole period during surgery and anesthesia was considered good.
She was continued on the heart monitor following surgery and had an uneventful period in the recovery room and reacted uneventfully.
She was returned to the room after approximately 3-½ hours recovery room period in good condition. She did well until late that night when she developed an irregular heart rythm (sic) and irreversible heart shock. All efforts to bring the heart back were unsuccessful.
I regret very much this result, but I can assure you everything was done possible to prevent what happened. Your Mother understood the risk and the procedure was discussed with her twice in the office, in the hospital before the operation and again prior to putting her asleep for the curative procedure. At no time was there a discussion of not trying to cure her or of going somewhere else for the operation.
No one does a biopsy with the intent of not immediately following up with a curative procedure. She not only authorized the surgery, but the risk was thoroughly discussed with her. She never mentioned wanting any other surgeon. Never have I done a biopsy of a breast and referred to patient for a definitive cancer procedure on the breast. Your Mother signed authorization for the biopsy and the radical mastectomy.
Your Mother was a lovely person and I believe she had confidence that I would do only what was best for her and she understood the treatment to be given.
Enclosed is a copy of the death certificate. Regret I failed to clarify all points concerning your Mother's death. Hope this will help to clarify any misunderstanding.
Thanking you for your confirming your Mother's confidence in me, I remain,
Sincerely yours,
s/R. McIntyre Bridges
R. McIntyre Bridges, M.D., FACS"

[3] This court has recently upheld the constitutionality of R.S. 9:5628 in Crier v. Whitecloud, 496 So.2d 305 (La.1986).