637 So.2d 415 (1994)
Nelita M. HUTCHINSON
v.
Navin P. PATEL, M.D., et al.
No. 93-C-2156.
Supreme Court of Louisiana.
May 23, 1994.
*417 Donald T.W. Phelps, Jay B. Mitchell, Daniel A. Reed, A. Edward Hardin, Baton Rouge, for applicant.
Richard M. Upton, Baton Rouge, for respondent.
Jane E. Booth, Metairie, for amicus curiae Louisiana Psychiatric Ass'n, Louisiana State Medical Soc.
KIMBALL, Justice.[*]
We granted certiorari in this case to consider whether the Louisiana Medical Malpractice Act[1] governs a plaintiff's claim against a hospital and a psychiatrist for their alleged failure to warn or take reasonable precautions to protect the plaintiff against a threat of physical violence communicated to the psychiatrist by a patient. After construing the Act's definition of "malpractice" in light of its context, the text of the Act as a whole, the purpose of the Act, and other laws on the same subject matter, we conclude the *418 Act applies exclusively to claims arising from injuries to or death of a patient where such claims are brought by the patients themselves, their representatives on the patient's behalf, or other persons with claims arising from injuries to or death of a patient. Finding the plaintiff's claim does not arise from injury to or death of a patient, we hold the Medical Malpractice Act does not govern her claim.
On September 27, 1990, Thomas Hutchinson, plaintiff's husband, voluntarily presented himself to Parkland Hospital in Baton Rouge seeking psychiatric treatment after an incident in which he had quarrelled violently with plaintiff and threatened her life. The hospital admitted Mr. Hutchinson under the care of Navin P. Patel, M.D., a licensed psychiatrist with privileges at the hospital. After treating Mr. Hutchinson with medication and psychiatric therapy, Dr. Patel released Mr. Hutchinson from Parkland on October 10, 1990.
On November 19, 1990, Mr. Hutchinson persuaded plaintiff to meet him in the parking lot of the apartment complex where they had formerly resided. During this meeting, Mr. Hutchinson shot plaintiff, permanently paralyzing her from the waist down. Mr. Hutchinson then turned the gun on himself and committed suicide.
Plaintiff filed suit in district court alleging Dr. Patel and Parkland Hospital breached their duty to warn her or to take other reasonable precautions to protect her against Mr. Hutchinson's violent behavior. In response, Dr. Patel filed an exception of prematurity seeking dismissal of the district court action on the grounds that the Louisiana Medical Malpractice Act requires plaintiff's claim to be submitted to a medical review panel prior to the filing of a civil action.
The trial court denied Dr. Patel's exception of prematurity. The Louisiana First Circuit Court of Appeal affirmed,[2] finding plaintiff's claim is not covered by the Medical Malpractice Act because it "does not involve the medical care or treatment of a patient." We granted Dr. Patel's writ application[3] and now affirm.
The duty of a psychotherapist to warn third parties of a threat of violence communicated by a psychiatric patient was first recognized by the California Supreme Court in Tarasoff v. Regents of the University of California, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976). In Tarasoff, 131 Cal.Rptr. at 25, 551 P.2d at 345, the court held that because a psychotherapist stands in a special relationship with a patient, the therapist has a duty first to exercise "that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of [that professional specialty] under similar circumstances" in predicting whether the patient poses a serious danger to others, and secondly "to exercise reasonable care to protect the foreseeable victim of that danger."
In Louisiana, the legislature recognized the existence of a therapist's "duty to warn" under Louisiana law by enacting La.R.S. 9:2800.2. At the time of plaintiff's injuries, the statute provided:
§ 2800.2. Psychologist and psychiatrist; limitation of liability
A. When a patient has communicated an immediate threat of physical violence against a clearly identified victim or victims, coupled with the apparent intent and ability to carry out that threat, a psychologist, licensed under R.S. 37:2351-2369, or a psychiatrist, licensed under R.S. 37:1261-1291, treating such patient and exercising reasonable professional judgment, shall not be liable for a breach of confidentiality for warning of such threat or taking precautions to provide protection from the patient's violent behavior.
B. A psychologist's or psychiatrist's duty to warn or to take reasonable precautions to provide protection from violent behavior arises only under the circumstance specified in Subsection A of this Section. This duty shall be discharged by the psychologist or psychiatrist if he makes a reasonable effort to communicate *419 the immediate threat to the potential victim or victims and to notify law enforcement authorities in the vicinity of the patient's or potential victim's residence.
C. No liability or cause of action shall arise against any psychologist or any psychiatrist based on an invasion of privacy or breach of confidentiality for any confidence disclosed to a third party in an effort to discharge the duty arising under Subsection A of this Section.[4]
In the present case, we must decide whether the Louisiana Medical Malpractice Act governs plaintiff's "Tarasoff claim" against Parkland Hospital and Dr. Patel.
The Louisiana Legislature enacted the Medical Malpractice Act in 1975 in response to a perceived medical malpractice insurance "crisis." Butler v. Flint Goodrich Hosp., 607 So.2d 517, 521 (La.1992); Galloway v. Baton Rouge Gen. Hosp., 602 So.2d 1003, 1005 (La. 1992); Everett v. Goldman, 359 So.2d 1256, 1261 (La.1978). The legislature intended the Act to reduce or stabilize medical malpractice insurance rates and to assure the availability of affordable medical services to the public. See id. To those ends, the Act confers upon qualified health care providers[5] two principal advantages in actions against them for malpractice. First, the liability of a qualified health care provider for all malpractice claims for injuries to or death of any one patient may not exceed $100,000, and the total amount recoverable from all defendants and the Patient's Compensation Fund[6] for all malpractice claims for injuries to or death of any one patient, exclusive of future medical care and related benefits, may not exceed $500,000 plus interest and costs. La.R.S. 40:1299.42(B). Second, no action for malpractice against a qualified health care provider or his or her insurer may be commenced in a court of law before the complaint has been presented to a medical review panel and the panel has rendered its expert opinion on the merits of the complaint, unless the parties agree to waive this requirement. La.R.S. 40:1299.47.
The Act applies solely to claims "arising from medical malpractice." La.R.S. 40:1299.41(I); see Sewell v. Doctors Hosp., 600 So.2d 577, 578 (La.1992). The Act defines "malpractice" as follows:
(8) "Malpractice" means any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient, including loading and unloading of a patient, and also includes all legal responsibility of a health care provider arising from defects in blood, tissue, transplants, drugs and medicines, or from defects in or failures of *420 prosthetic devices, implanted in or used on or in the person of a patient.
La.R.S. 40:1299.41(A) (emphasis added). The Act further defines "patient," "tort," and "health care" as follows:
(3) "Patient" means a natural person who receives or should have received health care from a licensed health care provider, under a contract, express or implied.
. . . .
(7) "Tort" means any breach of duty or any negligent act or omission proximately causing injury or damage to another. The standard of care required of every health care provider, except a hospital, in rendering professional services or health care to a patient, shall be to exercise that degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill.
. . . .
(9) "Health care" means any act, or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment or confinement.
La.R.S. 40:1299.41(A).
Unquestionably, Mr. Hutchinson was Dr. Patel's "patient"[7] to whom Dr. Patel rendered "health care," and Dr. Patel's alleged breach of his duty to warn or take reasonable precautions to protect plaintiff constitutes an unintentional "tort," all as defined in the Act. The question is whether Dr. Patel's alleged tortious conduct in failing to warn or take reasonable precautions to protect plaintiff was "based on" his treatment or failure to treat his patient, Mr. Hutchinson, within the meaning of the Act's definition of "malpractice." If so, then the Act governs plaintiff's claim and her suit is premature until a medical review panel has rendered its expert opinion on the merits of the complaint. Otherwise, plaintiff's suit may proceed in district court as an ordinary negligence action.
This court has noted on numerous occasions that because the Medical Malpractice Act limits the liability of health care providers in derogation of the general rights of tort victims, any ambiguities in the Act should be strictly construed against coverage. Branch v. Willis-Knighton Med. Ctr., 92-3086, p. 14 (La.4/28/94), 636 So.2d 211, 217; Kelty v. Brumfield, 633 So.2d 1210, 1216 (La.1994); Rodriguez v. Louisiana Med. Mut. Ins. Co., 618 So.2d 390, 394 (La. 1993); Galloway v. Baton Rouge Gen. Hosp., 602 So.2d 1003, 1005 (La.1992); Sewell v. Doctors Hosp., 600 So.2d 577, 578 (La.1992); see also Touchard v. Williams, 617 So.2d 885, 892 (La.1993); Monteville v. Terrebonne Par. Consol. Gov't, 567 So.2d 1097, 1100-01 (La.1990). On the other hand, legislation is a solemn expression of legislative will, therefore interpretation of a law is primarily the search for the legislature's intent. La.C.C. art. 1; Touchard, 617 So.2d at 888; Backhus v. Transit Cas. Co., 549 So.2d 283, 289 (La. 1989); Keelen v. State Dep't of Culture and Recreation, 463 So.2d 1287, 1289 (La.1985); H.C. Drew Manual Training School v. Calcasieu Nat'l Bank, 192 La. 790, 799, 189 So. 137, 140 (1939). Hence, when a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written, and no further interpretation may be made in search of the intent of the legislature. La.C.C. art. 9. When the language of the law is susceptible of different meanings, however, it must be interpreted as having the meaning that best conforms to the purpose of the law, and the meaning of ambiguous words must be sought by examining the context in which they occur and the text of the law as a whole. La.C.C. arts. 10 and 12. Additionally, laws on the same subject matter must be interpreted in reference *421 to each other. La.C.C. art. 13. If application of the foregoing rules of interpretation fails to illuminate definitively the legislature's intent, only then should the rule of strict construction apply to the interpretation of laws in derogation of common rights such as the Medical Malpractice Act. See, e.g., Branch, 92-3086, p. 14, 636 So.2d at 217; Rodriguez, 618 So.2d at 394; Touchard, 617 So.2d at 892.
In the circumstances of the present case, the Act's definition of "malpractice" is susceptible of different meanings because the phrase "based on" is ambiguous: "`Malpractice' means any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient...." La.R.S. 40:1299.41(A)(8). The parties' divergent interpretations of the phrase "based on" illustrate the ambiguity: Dr. Patel argues his alleged tortious conduct was "based on" his treatment or failure to treat Mr. Hutchinson because his alleged "duty to warn" plaintiff was "inextricably interwoven" with the exercise of his professional judgment in diagnosing and treating Mr. Hutchinson; plaintiff argues Dr. Patel's alleged tortious conduct was not "based on" his treatment or failure to treat Mr. Hutchinson because his alleged "duty to warn" plaintiff was "independent" of the professional standard of care he owed exclusively to Mr. Hutchinson. Thus, finding the Act's definition of "malpractice" ambiguous, we must ascertain the legislature's intent in light of the context of the definition, the text of the Act as a whole, the purpose of the Act, and laws on the same subject matter. If any ambiguity remains after such interpretation, we must strictly construe the ambiguity against coverage of the Act.
Examining the context of the Act's definition of "malpractice," we find support for the court of appeal's conclusion that the Act does not govern plaintiff's Tarasoff claim because the claim "does not involve the medical care or treatment of a patient" (emphasis added). We find apparent in the Act's definitions of "patient," "tort," "health care," and "malpractice" the legislature's recognition of the traditional rule of law allowing recovery for medical malpractice only where a physician-patient relationship exists as the result of an express or implied contract and where the physician breaches either the contract or his or her professional duty to the patient. See Green v. Walker, 910 F.2d 291, 293 (5th Cir.1990); 1 Louisell & Williams, Medical Malpractice ¶¶ 8.01-8.02 (1990); 61 Am. Jur.2d Physicians, Surgeons, and Other Healers §§ 158, 201-202 (1981); Annotation, What Constitutes Physician-Patient Relationship for Malpractice Purposes § 2, 17 ALR4th 132; cf. Branch, 92-3086, p. 14, 636 So.2d at 214.
Consistent with the traditional rule governing medical malpractice claims, the definition of "patient" requires the existence of "a contract, express or implied." La.R.S. 40:1299.41(A)(3). The definition of "tort," although cast in general terms as "any breach of duty or any negligent act or omission proximately causing injury or damage to another," sets forth the professional standard of care owed by every health care provider "to a patient." La.R.S. 40:1299.41(A)(7) (emphasis added). The definition of "health care" requires either an act, treatment, or failure to perform or furnish treatment "for, to, or on behalf of a patient during the patient's medical care, treatment or confinement." La.R.S. 40:1299.41(A)(9) (emphasis added). Additionally, the definition of "malpractice" itself specifically includes
failure to render services timely and the handling of a patient, loading and unloading of a patient, and also includes all legal responsibility of a health care provider arising from defects of blood, tissue, transplants, drugs and medicines, or from defects in or failures of prosthetic devices, implanted in or used on or in the person of a patient.

La.R.S. 40:1299.41(A)(8) (emphasis added).
Construing the definition of "malpractice" in the context of the foregoing provisions, we conclude the legislature clearly intended to codify the traditional rule in medical malpractice actions requiring either a physician's breach of the express or implied contract between him or her and a patient ("any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient"), or, more pertinent to *422 the allegations in the present case, a physician's breach of the professional standard of care owed by every health care provider to a patient ("any unintentional tort ... based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient"). La.R.S. 40:1299.41(A)(8). Under this interpretation, Dr. Patel's alleged "failure to warn" plaintiff does not constitute "malpractice" as defined in the Act because plaintiff was not Dr. Patel's patient pursuant to an express or implied contract establishing a physician-patient relationship.
Turning to an examination of the text of the Medical Malpractice Act as a whole, we find further evidence that the legislature intended to restrict application of the Act to claims arising from injuries to or death of a patient. First, the Act's requirement of pre-trial review by a medical review panel applies only to "a person having a claim under this Part for bodily injuries to or death of a patient on account of malpractice." La.R.S. 40:1299.41(E)(1) (emphasis added). Likewise, the Act's limitations on recovery against health care providers and the Patient's Compensation Fund apply only to "malpractice claims for injuries to or death of a patient." La.R.S. 40:1299.42(B) (emphasis added). Not surprisingly, the Act sets forth procedures for determining "if the patient is in need of future medical care and related benefits," La.R.S. 40:1299.43 (emphasis added), and creates the "Patient's Compensation Fund." La.R.S. 40:1299.44 (emphasis added). The Act then provides that its provisions regulate the extent and manner of a health care provider's and his or her insurer's liability "to a patient, or his representative"[8] only while malpractice liability insurance remains in force or security remains undiminished. La.R.S. 40:1299.45(A)(1) (emphasis added). Nothing in the Act suggests the legislature intended it to apply to claims other than those brought by a patient, a patient's representative on the patient's behalf, or other persons having claims arising from injuries to or death of a patient.
Interpreting "malpractice" as confined to claims arising from injuries to or death of a patient also best conforms to the purpose of the Medical Malpractice Act. As noted previously, the purpose of the Act is to reduce or stabilize medical malpractice insurance rates and to ensure the availability of affordable medical services to the public. Medical malpractice insurance policies typically insure health care providers against claims arising from the rendering or failure to render professional services, 2 Rowland H. Long, The Law of Liability Insurance § 12.12 (1991); William S. McKenzie & H. Alston Johnson III, Insurance Law and Practice, 15 La.Civ.L. Treatise § 201 (1986)claims which, as explained earlier, traditionally require the existence of a physician-patient relationship. It appears, therefore, that medical malpractice insurance rates should not be affected by risks associated with claims arising from injuries to or deaths of non-patients to whom, by definition, no professional services were rendered or should have been rendered, and for which the typical medical malpractice insurance policy may not provide coverage. Likewise, no meaningful connection exists between the costs of medical services and the incidence of claims against health care providers arising from acts other than the rendering or failure to render medical services resulting in injuries to or death of a patient. Surely the legislature did not intend to control the rising costs of medical services by limiting health care providers' liability for acts unrelated to the provision of medical services. Thus, interpreting "malpractice" to include claims arising from injuries to or death of a non-patient would not promote the purpose of the Act.
Dr. Patel, as well as the Louisiana Psychiatric Association and the Louisiana State Medical Society as amici curiae, argue that interpreting "malpractice" to exclude Tarasoff claims would frustrate the Medical Malpractice Act's purpose of guaranteeing insurance coverage for health care providers by creating a "potential gap" between malpractice coverage and comprehensive general *423 liability (CGL) coverage. If a therapist's "failure to warn" a third party is not "malpractice," they argue, then the therapist's malpractice insurancewhich therapists statewide have obtained in order to qualify under the Actmay not provide coverage for such claims. On the other hand, they point out that CGL policies purchased to provide coverage against non-professional risks associated with a therapist's practice routinely exclude coverage of claims arising from the rendering or failure to render professional services. Because Tarasoff claims inherently question the therapist's professional judgment in diagnosing and treating a patient, they argue, a CGL insurer also may exclude coverage for such claims, thus leaving the therapist with no insurance coverage at all.
In arguing the premise that Tarasoff claims inherently question a therapist's professional judgment in diagnosing and treating a patient, Dr. Patel cites the California Supreme Court's decision in Hedlund v. Superior Court of Orange County, 34 Cal.3d 695, 194 Cal.Rptr. 805, 669 P.2d 41 (1983). In Hedlund, the court held a psychotherapist's "failure to warn" a third party constituted "professional negligence" within the meaning of California's Medical Injury Compensation Reform Act (M.I.C.R.A.). After noting the statutory definition of "professional negligence" is not limited to injury or wrongful death of a patient,[9] the court concluded the plaintiff's Tarasoff claim "sounds in professional negligence because the duty imposed on a therapist in that case is first to diagnose or recognize the danger posed by the patient and only then to warn. The warning aspect of this duty ... is inextricably interwoven with the diagnostic function." Id., 194 Cal.Rptr. at 809, 669 P.2d at 45.
Dr. Patel urges this court to adopt the Hedlund court's reasoning and to hold that because his alleged "duty to warn" plaintiff was "inextricably interwoven" with the exercise of his professional judgment in diagnosing and treating Mr. Hutchinson, his alleged tortious conduct therefore was "based on" his treatment or failure to treat Mr. Hutchinson within the meaning of the Medical Malpractice Act's definition of "malpractice." To hold otherwise, he maintains, might allow both his malpractice insurer and his CGL insurer to deny coverage of plaintiff's claim, thereby defeating the Act's purpose by creating a "potential gap" in insurance coverage.
Plaintiff, on the other hand, argues Dr. Patel's alleged tortious conduct was not "based on" his treatment or failure to treat Mr. Hutchinson because his alleged "duty to warn" plaintiff was "independent" of the professional standard of care he owed exclusively to Mr. Hutchinson. According to plaintiff, a therapist might treat his patient in accordance with all applicable professional standards and yet still breach his or her "duty to warn" the third party victim. Plaintiff cites Midtown Community Mental Health Center v. Estate of Gahl, 540 N.E.2d 1259, 1262 (Ind.App. 1st Dist.1989), where the court, interpreting a definition of "malpractice" which is virtually identical to Louisiana's,[10] noted the plaintiffs' claim was based "not solely upon the appropriateness of the defendants' medical care, rather the claim was based also upon the defendants' failure to warn Gahl about Jackson's dangerous propensities." The court concluded: "The purpose of the Medical Malpractice Act is unrelated to the sort of liability a health care provider risks when a patient commits a criminal act against a third party." Id.
We agree with plaintiff's argument and reject the arguments of Dr. Patel and amici for several reasons. First, unlike the definitions of "malpractice" interpreted in Gahl and contained in Louisiana's Medical *424 Malpractice Act when interpreted in context and in light of the text of the Act as a whole, the definition of "professional negligence" interpreted in Hedlund is not limited to claims arising from injuries to or death of a patient. Second, the "potential gap" Dr. Patel and amici argue would result from excluding Tarasoff claims from the scope of the Medical Malpractice Act's coverage is just that"potential"and therefore the argument is speculative. Third, we disagree with the Hedlund court's reasoning that a therapist's "duty to warn" a third person is "inextricably interwoven with the diagnostic function." Under our reading of Tarasoff, the duty to predict whether a patient poses a serious danger to others and the duty to warn the foreseeable victim of that danger are separate and distinct duties governed by completely different standards of care: the duty to predict whether a patient poses a serious danger to othersi.e., to diagnose the patientis owed to the patient and requires the exercise of "that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of [that professional specialty] under similar circumstances"; the duty to warn the foreseeable victim of that danger is owed to the third party and requires the exercise of "reasonable care under the circumstances." Tarasoff, 131 Cal.Rptr. at 25, 551 P.2d at 345. In other words, once a therapist exercises his or her professional judgment in predicting or failing to predict that a patient poses a serious danger of violence to others, his or her performance of the duty to warn or to take reasonable precautions to protect the foreseeable victim of that danger does not require any further exercise of the therapist's professional judgment, but only "reasonable care under the circumstances." See id.
Louisiana's "duty to warn" statute, La.R.S. 9:2800.2,[11] incorporates the distinction recognized in Tarasoff between the professional standard of care governing a therapist's duty to predict whether a patient presents a serious danger of violence to others and the standard of reasonable care governing the therapist's duty to warn or take reasonable precautions to protect the foreseeable victim of that danger. Subsection A of the statute grants a therapist immunity from liability for breach of confidentiality for warning or taking precautions to protect a clearly identified victim or victims against a threat of physical violence communicated to the therapist where the threat is coupled with the apparent intent and ability to carry out the threat and the therapist is "treating such patient and exercising reasonable professional judgment." La.R.S. 9:2800.2(A) (emphasis added). Subsection B of the statute provides that the therapist's duty to warn or take reasonable precautions to protect the third person shall be discharged by the therapist if he or she "makes a reasonable effort to communicate the threat to the potential victim or victims and to notify law enforcement authorities in the vicinity of the patient's or potential victim's residence." La.R.S. 9:2800.2(B) (emphasis added). Thus, in predicting whether a patient's threat is serious enough to justify breaching the confidentiality of the therapist-patient relationship, a therapist must exercise "reasonable professional judgment" under La.R.S. 9:2800.2(A), while under La.R.S. 9:2800.2(B) the therapist may discharge his or her "duty to warn" the potential victim or victims by making a "reasonable effort" to warn of the threat and to notify law enforcement authoritiesi.e., by exercising reasonable care under the circumstances. The "duty to warn" itself does not require the exercise of professional judgment and therefore is not "inextricably interwoven with the diagnostic function."
Amici suggest the legislature's amendment of La.R.S. 9:2800.2 by Act 764 of 1993,[12] which in part added a requirement that the patient's threat be "deemed to be significant in the clinical judgment of the treating psychologist or psychiatrist" (emphasis added), is interpretive and therefore applies retroactively to plaintiff's claim. According to amici, the amendment establishes "clinical judgment" as the governing standard in "failure to warn" cases and indicates *425 that the legislature considers a therapist's "failure to warn" to be medical malpractice. We find, however, that even if the amendment applies retroactively in this case, it does not affect the result of our analysis of La.R.S. 9:2800.2 in relation to the Medical Malpractice Act. Just as the therapist's "duty to warn" a third person, as distinguished from the therapist's duty to diagnose his or her patient, does not require the exercise of "professional judgment," nor does it require the exercise of "clinical judgment" under the amendment. We therefore find it unnecessary at this time to decide whether the amendment applies retroactively in this case.
Thus, we question Dr. Patel's premise that a therapist's "duty to warn" a third party is "inextricably interwoven" with the therapist's diagnosis and treatment of a patient. Although the therapist exercises or fails to exercise professional or clinical judgment in diagnosing the patient to predict whether the patient presents a serious danger to others, thereby giving rise to the "duty to warn" a third person, the therapist need only exercise reasonable care under the circumstances to discharge this duty. Consequently, a therapist's breach of the "duty to warn" is not "based on" the exercise or failure to exercise professional judgment within the meaning of the Medical Malpractice Act's definition of "malpractice," but rather is "based on" the failure to exercise reasonable care under the circumstances. For this reason, in addition to other reasons previously mentioned, we reject Dr. Patel and amici's contention that interpretation of "malpractice" to exclude Tarasoff claims would frustrate the Act's purpose of guaranteeing malpractice insurance coverage for health care providers.[13]
For similar reasons, we also reject Dr. Patel's additional argument that treating nonpatient claims against health care providers differently from patient claims would frustrate the Act's purpose of ensuring the availability of affordable health care to the public. In so arguing, Dr. Patel again relies on Hedlund, supra, as well as a decision by the New Mexico Supreme Court in Wilschinsky v. Medina, 108 N.M. 511, 775 P.2d 713 (1989), and a decision by the Louisiana Second Circuit Court of Appeal in Thomas v. LeJeune, Inc., 501 So.2d 1075, 1077 (La.App. 2d Cir.1987).
In Hedlund, 669 P.2d at 45-46, the California Supreme Court offered the following additional reasons for its holding that "professional negligence" under M.I.C.R.A. encompasses a therapist's "failure to warn" a third person:
When a health care provider's professional negligence results in harm to parties other than a patient the legislative purpose of reducing health care costs by reducing the dollar amount of judgments in actions for failure to warn would be frustrated if the M.I.C.R.A. restrictions were not applicable. It would be anomalous, too, if a third party's cause of action based on the same negligent act were treated differently than an action by the patient.
In Wilschinsky, supra, a plaintiff sued a physician for damages allegedly caused when the physician negligently administered medication to a patient who shortly thereafter drove an automobile which struck and seriously injured the plaintiff. In deciding whether New Mexico's Medical Malpractice Act applied to the plaintiff's claim against the physician, the New Mexico Supreme Court noted that "[u]nder principles of narrow construction, generally we would find this cause of action is not covered by the definitional section and is therefore outside the Act."[14]Wilschinsky, 775 P.2d at 719. The *426 court nevertheless concluded the legislature did not intend "to restrict the definition of `malpractice claim' to only those instances resulting in injury to patients," reasoning as follows:
While courts normally are bound to follow legislative definitions, they are not bound when a definition would result in an unreasonable classification. Here, an unreasonable classification would result, as only patients with direct injuries from acts of malpractice would be denied full recovery under the Act.... A major purpose of the Medical Malpractice Act was to meet a perceived insurance crisis and to regulate the tort liability of medical professionals for acts of medical malpractice. When we find, as we do here, a clash between the intent of the legislature and its own definitional section, we seek to harmonize the two.
Id., 775 P.2d at 719 (citation omitted).
In Thomas, supra, the defendant tortfeasor, LeJeune, Inc., filed a third-party demand in district court against a physician and hospital seeking indemnification or contribution for damages allegedly caused by their negligent treatment of the plaintiff tort victim. In response to the physician and hospital's exception of prematurity, LeJeune argued the Medical Malpractice Act applies only when the patient or claimant, or a representative of a patient or claimant, files suit against a health care provider. The Louisiana Second Circuit Court of Appeal rejected LeJeune's argument, stating:
Acceptance of LeJeune's argument would place a non-patient claimant in a medical malpractice action in a more favorable position than a patient claimant.
... [A]ll claims against health care providers for malpractice must first go through the Medical Malpractice Act procedure, regardless of whether the claimant is a patient or a non-patient.
Thomas, 501 So.2d at 1077.
We disagree with Dr. Patel and with the reasoning of each of these courts insofar as they suggest it would be "anomalous" or would create an "unreasonable classification" to limit application of the Medical Malpractice Act to claims brought by patients, by representatives of patients on the patient's behalf, or by other persons with claims arising from injuries to or death of a patient, to the exclusion of persons with other types of claims against health care providers. We explain the Act's different treatment of such patient claims and non-patient claims by the fact that patients expressly or impliedly contract with health care providers for the rendering of health care or professional services, whereas non-patients do not. As explained earlier, where no physician-patient relationship exists pursuant to such a contract so that the health care provider's tortious conduct does not involve the rendering or failure to render health care or professional services to the tort victim, application of the procedures and liability limits imposed by the Act would benefit health care providers without promoting the Act's purpose of ensuring the availability of affordable health care to the public. Accordingly, interpretation of the Act to exclude non-patient claims which do not arise from injuries to or death of a patient best conforms to the purpose of the Act.[15]
*427 Next, we must interpret the Medical Malpractice Act in reference to laws on the same subject matter. Dr. Patel and amici point out that the Louisiana Malpractice Liability for State Services Act ("State Act"), La.R.S. 40:1299.39, which governs claims arising out of state-provided health care, defines "malpractice" to expressly limit its application to claims alleging injury to a patient, as follows: "`Malpractice' means the failure to exercise the reasonable standard of care specified and required by Subsection B of this Section, in the provision of health care, when such failure proximately causes injury to a patient...." La.R.S. 40:1299.39(A)(4) (emphasis added). Dr. Patel and amici argue the absence of such limiting language in the private Medical Malpractice Act's definition of "malpractice" evidences the legislature's intention to expand application of the private Act to claims such as plaintiff's which do not arise from injuries to or death of a patient.
Dr. Patel compares this case to Sibley v. Board of Supervisors of Louisiana State University, 477 So.2d 1094 (La.1985), where this court reasoned the State Act did not apply to claims of negligence against a state hospital board because at that time the State Act defined "health care provider" in pertinent part as "[a]ny individual acting in a professional capacity in providing health care services, by or on behalf of the state," whereas the private Act broadly defined "health care provider" to include corporations, facilities, or institutions providing health care. "The legislature's strategic use of these specific terms to expand the private Malpractice Act's scope of protection over that of the contemporaneously adopted State Act," stated the court, "indicates that the omission of such provisions from the latter piece of legislation was intentional and should not be construed as a tacit invitation for judicial gloss." Id. at 1102. The court further stated in dictum:
By defining health care to include any act or omission performed by any health care provider for, to, or on behalf of a patient, the private malpractice act protects against statutorily excessive judgments based not just on malpractice, but on virtually any breach of duty or contract causing injury or damage.
Id.
We do not believe our dictum in Sibley mandates a finding that the private Medical Malpractice Act applies to claims other than those arising from injuries to or death of a patient. Instead, we read that dictum in the context of the issue presented in that case, which was whether the State Act governed a claim against a state hospital board as a "health care provider" as defined in the State Act. Interpreting the State Act's definition of "health care provider" in reference to the private Act's much broader definition of the same term, the Sibley court highlighted the private Act's expanded scope of protection as evidence that the legislature's restriction of the State Act's protection to "individual" health care providers was intentional. The Sibley court by no means intended to dictate the parameters of protection afforded by the private Act.
In the present case, Dr. Patel and amici highlight the State Act's narrowly drawn definition of "malpractice" as evidence that the legislature intended the apparently broader definition in the private Act to apply to a broader class of claims and claimants. On closer examination, however, we find the State Act's definition of "malpractice," when construed together with the State Act's broad definitions of "patient" and "representative," actually is no narrower than the private Act's definition of "malpractice" as we construe it. The State Act defines "patient" and "representative" as follows:
(3) "Patient" means a natural person who receives or should have received health care from a person covered by this Part and any other natural person or persons who would or may have a claim or claims for damages under applicable law arising out of or directly related to the claim or claims of the natural person who receives or should have received health care from a person covered by this Part.
. . . .

*428 (5) "Representative" means a person who is a parent, tutor, curator, spouse, trustee, attorney, or other legal agent of the patient and who is authorized, by and on behalf of the patient, to exercise any of the patient's rights, privileges, or immunities granted by this Section or to fulfill any of the patient's obligations, duties, or forbearances imposed under this Section, because the patient has executed a written authorization and mandate to that effect or because the law operates to that effect due to the status of that patient and his relationship to such person, as when the patient is a minor child and his parent must act for him. After the death of the patient, "representative" shall also mean and include the executor of a patient's will, the administrator of his estate, the surviving spouse of the patient, the patient's children, or if they are minors, their legal representatives, any of the patient's heirs, successors, legatees, or assigns, and/or any other person who may have any interest in any recovery arising out of the death of the patient or in the bringing of any action or the making of any demands or claims with regard to such patient.
Construing the State Act's definition of "malpractice" in the context of the foregoing definitions, we find the scope of the definition similar if not identical to the scope of the private Act's definition of "malpractice" when construed in context and in light of the text of the Act as a whole. "Malpractice" under both Acts is limited to claims arising from injuries to or death of a patient, and persons asserting such claims must be patients, their representatives acting on the patient's behalf, or other persons with claims arising from injuries to or death of a patient. Thus, contrary to Dr. Patel's and amici's assertions, interpretation of the private Act's definition of "malpractice" in reference to the State Act supports an interpretation of that term as excluding claims arising from injuries to or death of a non-patient.
Finally, as noted previously, because the Medical Malpractice Act limits the liability of health care providers in derogation of the rights of tort victims, we should strictly construe any remaining ambiguities in the definition of "malpractice" against coverage of the Act. We find such strict construction unnecessary in this case, however, as our application of the general rules of interpretation has definitively illuminated the legislature's intent.
In sum, after construing the Medical Malpractice Act's definition of "malpractice" in light of its context, the text of the Act as a whole, the purpose of the Act, and other laws on the same subject matter, we conclude "malpractice" encompasses either a health care provider's breach of the express or implied contract between him or her and a patient, or a health care provider's breach of the professional standard of care owed by every health care provider to a patient, where such breach proximately causes injury to or death of that patient. We further conclude the Act applies exclusively to claims arising from injuries to or death of a patient where such claims are brought by the patients themselves, their representatives on the patient's behalf, or other persons with claims arising from injuries to or death of a patient. Accordingly, we hold the Act does not govern plaintiff's claim against Dr. Patel and Parkland Hospital because her claim does not arise from injury to or death of a patient.
For the foregoing reasons, we affirm the judgments of the court of appeal and district court denying Dr. Patel's exception of prematurity, and remand this case to the district court for further proceedings.
AFFIRMED AND REMANDED.
HALL and ORTIQUE, JJ., concur and assign reasons.
ORTIQUE, Justice, concurring.
In my view, the defendant attempted to confuse the trial court by arguing that the cause of action brought by plaintiff arises out of medical malpractice. Defendant seeks to avail himself of a medical review proceeding in order to secure an opinion in which no liability is found, in turn hoping that such an opinion would influence a trial judge or jury to find no liability. Likewise, defendant seeks to shield himself from liability for damages which may exceed the cap imposed upon *429 the recovery of plaintiffs in medical malpractice actions.
The Louisiana Legislature anticipated such machinations and enacted La.R.S. 9:2800.2. As the majority concludes, defendant's exception of prematurity has no bearing on, nor does it diminish in anyway the cause of action brought by plaintiff under La.R.S. 9:2800.2. By enacting La.R.S. 9:2800.2, Louisiana joined other jurisdictions in recognizing the duty of a psychologist, psychiatrist or board certified social worker to warn a third person when a threat of violence against the third person has been communicated to the treating professional.
Plaintiff clearly pleads a claim in tort pursuant to La.R.S. 9:2800.2 rather than a claim in medical malpractice, distinct, separate and apart from the contemplation of the legislature under the Louisiana Medical Malpractice Act.
HALL, Justice, concurring.
I agree that the language of the Louisiana Medical Malpractice Act limits its applicability to claims brought by the patient, a representative on the patient's behalf, or other persons with claims arising from injury or death to a patient. Thus, in this case, the claim of plaintiff who was injured by a patient and was not herself a patient is not governed by the Act.
That the Act applies only to claims by patients is amply demonstrated in the well-written majority opinion by reference to the numerous provisions in the Act referring to injuries to or death of a "patient".
I concur only to state that it is not necessary to go beyond the plain language of the statute, as the majority opinion does, to reach this conclusion. In particular, I question the discussion in the majority opinion of the nature of the therapist's duty to warn as either involving or not involving "reasonable professional judgment" or "clinical judgment", and other discussion seemingly related to the potential issue of insurance coverage, or a gap therein. Potential issues of insurance coverage are a concern, but are not presented in this case. Discussion of matters bearing on insurance coverage should await a case presenting those issues where the particular insurance policy provisions are before the court. Applicability of the Medical Malpractice Act and coverage under malpractice or general liability insurance policies are not necessarily governed by the same principles.
NOTES
[*] Calogero, C.J., not on panel. See La.S.Ct. Rule IV, Part 2, § 3.

Charles A. Marvin, C.J., Court of Appeal, Second Circuit, sitting in place of Justice James L. Dennis.
[1] La.R.S. 40:1299.41-1299.48.
[2] 626 So.2d 368 (La.App. 1st Cir.1993).
[3] 629 So.2d 374 (La.1993).
[4] By Act 764 of 1993, the Louisiana Legislature amended La.R.S. 9:2800.2 to read as follows:

A. When a patient has communicated a threat of physical violence, which is deemed to be significant in the clinical judgment of the treating psychologist or psychiatrist, or board-certified social worker, against a clearly identified victim or victims, coupled with the apparent intent and ability to carry out such threat, the psychologist, licensed under R.S. 37:2351-2369, or the psychiatrist, licensed under R.S. 37:1261-1291, or the board-certified social worker, licensed under R.S. 37:2701 through 2719, treating such patient and exercising reasonable professional judgment, shall not be liable for a breach of confidentiality for warning of such threat or taking precautions to provide protection from the patient's violent behavior.
B. A psychologist's or psychiatrist's or board-certified social worker's duty to warn or to take reasonable precautions to provide protection from violent behavior arises only under the circumstance specified in Subsection A of this Section. This duty shall be discharged by the psychologist or psychiatrist if he makes a reasonable effort to communicate the threat to the potential victim or victims and to notify law enforcement authorities in the vicinity of the patient's or potential victim's residence.
C. No liability or cause of action shall arise against any psychologist or any psychiatrist based on an invasion of privacy or breach of confidentiality for any confidence disclosed to a third party in an effort to discharge the duty arising under Subsection A of this Section.
[5] The parties do not dispute that Dr. Patel and Parkland Hospital are "qualified health care providers" within the meaning of the Act. See La. R.S. 40:1299.41(A)(1) (defining "health care provider"); La.R.S. 40:1299.42(A) (setting forth the requirements for qualification under the Act).
[6] See La.R.S. 40:1299.44 (providing for the creation, funding, and administration of the "Patient's Compensation Fund").
[7] The Louisiana Psychiatric Association and the Louisiana State Medical Society as amici curiae argue plaintiff was Dr. Patel's "patient" within the meaning of the Act because plaintiff allegedly participated in one or more of her husband's therapy sessions while he was under Dr. Patel's care at Parkland Hospital. As this issue is argued for the first time on appeal, however, we decline to address it. See Segura v. Frank, 630 So.2d 714, 725; Fried v. Bradley, 219 La. 59, 87, 52 So.2d 247, 257 (1950) (collecting cases).
[8] "`Representative' means the spouse, parent, guardian, trustee, attorney or other legal agent of the patient." La.R.S. 40:1299.41(A)(6) (emphasis added).
[9] The California statute defines "professional negligence" as follows:

"Professional negligence" means a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital.
Cal.Code Civ.Proc. § 340.5(2).
[10] The Indiana Medical Malpractice Act defined "malpractice" as "any tort or breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient." Ind. Code § 16-9.5-1-1(h).
[11] See supra text accompanying note 4 for text of La.R.S. 9:2800.2 as it existed at the time of plaintiff's injuries.
[12] See supra note 4 for text of La.R.S. 9:2800.2 as amended by Act 764 of 1993.
[13] Cf. Grant v. Touro Infirmary, 254 La. 204, 223 So.2d 148 (1969), where this court held the defendant hospital's surgical nurses' failure to properly count sponges during surgery was not "service of a professional nature" within the meaning of a "Malpractice and Professional Services" exclusion in the hospital's general liability policy, therefore the policy provided coverage for the patient's injuries. "`It seems to us that in determining whether or not a particular act or failure to act is of a professional nature,'" quoted the court, "`we should look not to the title or the character of the party performing the act but to the act itself.'" Id. at 215, 223 So.2d at 152 (quoting D'Antoni v. Sara Mayo Hosp., 144 So.2d 643, 646 (La.App. 4th Cir.1962)).
[14] The New Mexico Medical Malpractice Act defined "malpractice claim" as "any cause of action arising in this state against a health care provider for medical treatment, lack of medical treatment or other claimed departure from accepted standards of health care which proximately results in injury to the patient." NMSA 1978, § 41-5-3(C) (Repl.Pamp.1986).
[15] We note that although we disapprove of the second circuit's reasoning in Thomas to the extent it suggests that excluding any non-patient claims from application of the Medical Malpractice Act would unreasonably treat non-patient claimants differently than patient claimants, we agree with that court's conclusion that the Act governs "all claims against health care providers for malpractice ... regardless of whether the claimant is a patient or a non-patient." Thomas, 501 So.2d at 1077 (second emphasis added). We emphasize, however, that the Act applies exclusively to claims arising from injuries to or death of a patient, therefore non-patient malpractice claimants must be either representatives of patients acting on the patient's behalf, or other persons with claims arising from injuries to or death of a patient. Cf. Gobble v. Baton Rouge Hosp., 415 So.2d 425 (La.App. 1st Cir.1982) (holding the Act applies to wrongful death action brought by the surviving spouse and children of a deceased patient); Hines v. Bick, 566 So.2d 455 (La.App. 4th Cir.), writ denied, 571 So.2d 648 (1990) (characterizing as a medical malpractice action a suit by a patient and his wife against the patient's psychiatrist and hospital for negligently failing to prevent the patient from killing a third person).