JiHIGHTOWER, Judge.
Arguing that their suit against a doctor and hospital for the alleged negligent misinterpretation of drug test results does not fall under the Medical Malpractice Act, Marla and Robert Price appeal a judgment sustaining an exception of prematurity. Rejecting plaintiffs’ contentions, we affirm.

Facts and Procedural History

Marla Price (“Price”), after a work accident and at the suggestion of her employer, Horseshoe Casino, submitted herself for the evaluation of an arm injury at Bossier Medical Center. Finding no fractures, the examining physician prescribed pain medication and a sling. Next, Price received instructions to go to the laboratory for drug screening. Such testing, required by Horseshoe’s *1227 employment polices, did not appear to be medically necessary nor did Price solicit the procedure. On her consent form, she indicated she had recently used a pain reliever and a nasal spray. She also noted that she had eaten poppy seed dressing shortly before the test.
The initial screening at the medical center showed positive for morphine use. Mayo Medical Lab in Minnesota utilized another portion of the urine specimen to confirm this result, disclosing the presence of 434 ng/ml morphine.[1] This latter report also included a notation, “Presence of morphine at low concentration (<2000 ng/ml) may be due to poppy seed ingestion.”
The hospital’s Medical Review Officer (“MRO”), Dr. Gary Mazzanti, thereafter signed the chain of custody form and made his final determination that the employee’s urine tested positive for morphine. Upon receipt of this information and pursuant to their established policy, Horseshoe discharged Price.[2] According to her petition, she then voluntarily contracted for a second drug screen, with a different testing facility, which produced a negative finding.
| ^Approximately six months later, in August 1995, Price and her husband filed suit against the City of Bossier City d/b/a Bossier Medical Center and Dr. Mazzanti. Defendants responded with an exception of prematurity premised upon La. R.S. 40:1299.47B(l)(a)(i). Agreeing that the “nature of the services provided” required that the complaint initially be presented to a medical review panel, the lower court granted the exception and dismissed the Prices’ suit without prejudice. This appeal ensued.

Discussion

Plaintiffs seek to characterize their allegations as simply asserting various violations of the Drug Testing legislation, La. R.S. 49:1001, et seq., and the statutorily incorporated NIDA guidelines. Continuing, they argue that such narrowly viewed claims can indeed be resolved in district court. The Prices’ pleadings, however, when accurately and realistically read, ultimately complain that Dr. Mazzanti’s medical judgment and misinterpretation of the laboratory reports resulted in his decision to assign a positive result. Thus, the petition clearly states claims based upon medical malpractice.
According to La. R.S. 49:1001(10), an MRO must be a licensed physician, who has knowledge of substance abuse disorders and has appropriate medical training to interpret and evaluate an individual’s positive test result together with his or her medical history and any other relevant biomedical information. Our drug testing statute thus recognizes that the MRO will need to call upon his medical expertise in formulating evaluations. Drug testing obviously is not, as plaintiffs suggest, a mere mechanical following of statutory procedures. Although the statute and guidelines specify certain factors that the MRO should review when faced with a positive test result, no fixed rule can designate how a doctor should interpret an individual set of circumstances. Only through a physician’s training and expertise can such a determination be made. Thus, recognizing that Dr. Mazzanti’s duties required that he render services in accordance with not only drug testing legislation but also his medical training and expertise, the issue before us becomes whether his actions, or inactions, fall within the scope of the Louisiana Medical Malpractice Act.
|gThe Medical Malpractice Act, as suggested by its title, applies to claims arising from medical malpractice. La. R.S. 40:1299.41(1). “Malpractice” is defined as
any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient, including loading and unloading of a patient, and also includes all legal *1228 responsibility of a health care provider arising from defects in blood, tissue, transplants, drugs and medicines, or from defects in or failures of prosthetic devices, implanted in or used on or in the person of a patient. [Emphasis added.]
La. R.S. 40:1299.41A(8).
A “patient,” as stated within La. R.S. 40:1299.41A(3), is a natural person who receives, or should have received, health care from a licensed health care provider, under an express or implied contract. The Act also delineates “tort” to mean
any breach of duty or any negligent act or omission proximately causing injury or damage to another. The standard of care required of every health care provider, except a hospital, in rendering professional services or health care to a patient, shall be to exercise that degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill.
La. R.S. 40:1299.41A(7).
Stiffly measured, the definition of “patient” might lead to the postulate that malpractice solely involves claims based on “health care” (La. R.S. 40:1299.41A(9)) to the exclusion of professional services. Such a limited sphere, plaintiffs suggest, would potentially include only conventional notions of treatment. The statute, however, specifically provides that torts or contractual breaches arising out of a provider’s rendition of professional services are covered by the Medical Malpractice Act. Accordingly, while Price did not receive, and did not intend to receive, any medical treatment or advice as a result of the drug screening, Dr. Mazzanti unquestionably furnished professional services that involved her.
Granted, inasmuch as the Act limits the liability of health care providers in derogation of general tort law, any ambiguities should be construed against coverage Uunder the statute. Hutchinson v. Patel, 93-2156 (La. 05/23/94), 637 So.2d 415. Our supreme court, nevertheless, has cautioned:
On the other hand, legislation is a solemn expression of legislative will, therefore interpretation of a law is primarily the search for the legislature’s intent. [Citations omitted.] Hence, when a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written, and no further interpretation may be made in search of the intent of the legislature. La. C.C. art. 9. When the language of the law is susceptible of different meanings, however, it must be interpreted as having the meaning that best conforms to the purpose of the law, and the meaning of ambiguous words must be sought by examining the context in which they occur and the text of the law as a whole. La. C.C. arts. 10 and 12_ If application of the foregoing rules of interpretation fails to illuminate definitively the legislature’s intent, only then should the rule of strict construction apply to the interpretation of laws in derogation of common rights such as the Medical Malpractice Act. [Citations omitted.]
Hutchinson, supra at 420,421.
In the present matter, a straightforward reading of the Act discloses the lawgiver’s intended inclusion of claims arising out of both treatment and professional services rendered on behalf of a patient. Although Horseshoe initiated the contact between Price and Dr. Mazzanti, she became a patient receiving, and expecting, professional services to be provided by this physician in an exercise of his best judgment, reasonable care, and due diligence. Cf. Pena v. Fann, 95-2709 (La.App. 4th Cir. 07/03/96), 677 So.2d 1091; Green v. Walker, 910 F.2d 291 (5th Cir.1990).

Conclusion

Accordingly, for the foregoing reasons, we affirm the judgment below at appellants’ costs.
AFFIRMED.
NORRIS, J., dissents with written reasons.

. Pursuant to the National Institute on Drug Abuse ("NIDA”) guidelines, the threshold for confirming morphine is 300 ng/ml. See La. R.S. 49:1005(B); 53 Fed.Reg. 11970, ¶ 2.4(f)(1) (1988).

. At oral argument, Price’s attorney stated that plaintiff had been rehired several weeks later.