11 KIRBY, J.
Plaintiffs, Mr. Donald Patín and Ms. Lorraine Randolph, appeal the granting of an Exception of Prematurity, based on the finding of the trial court that their claim fell under the Louisiana Medical Malpractice Act (MMA). - We reverse because distribution of blood between hospitals does not qualify as health care under the MMA.

STATEMENT OF THE FACTS

In August 1980, Donald Patín was hospitalized at Tulane Medical Center. While hospitalized, Mr. Patín underwent cardiac catheterisation and the excision of a sub-valvular membrane. As a consequence of these procedures, Mr. Patín was required to receive blood transfusions. As a result of these transfusions, Mr. Patín was exposed to and subsequently contracted the HIV virus. It is believed that Touro Infirmary supplied the contaminated blood to Tulane Medical Center.
On January 31, 1997, Mr. Patín was informed of his HIV positive status. On January 30, 1998, Mr. Patín filed this instant suit. In response to Mr. Patin’s first ^supplemental and amending petition, Touro filed an exception of prematurity based on the requirement of the MMA that medical malpractice claims be submitted to a medical review panel before suit may be filed. On May 17, 1999, the trial court granted Touro’s Exception of Prematurity, which dismissed plaintiffs action without prejudice. From this final judgment plaintiff appeals.

LEGAL ANALYSIS

Under the Medical Malpractice Act, no action for medical malpractice against a health care provider may be presented for judicial review before the complaint has been presented to a medical review panel. La. R.S. 40:1299.47. The *818 MMA applies only to actions that arise from medical malpractice. Hutchinson v. Patel, 93-2156 (La.5/23/94); 637 So.2d 415, 419.
The MMA defines malpractice and health care as follows:
(8) “Malpractice” means any unintentional tort or breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient, including loading and unloading of a patient, and also includes all legal responsibility of a health care provider arising from defects in blood, tissue, transplants, drugs and medicines, or from defects in or failures of prosthetic devices, implanted in or used on or in the person of a patient. (Emphasis added.)
(9) “Health care” means any act, or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient’s medical care, treatment or confinement.
La. R.S. 40:1299.41 A
[¡¡The Medical Malpractice Act limits the liability of health care providers. Due to this limitation of a victim’s general rights in tort, any ambiguities should be strictly construed against coverage. Hutchinson v. Patel, 93-2156 (La.5/23/94); 637 So.2d 415, 420; Kelty v. Brumfield, 93-C-1142 (La.2/25/94); 633 So.2d 1210, 1216.
For this transfer of blood from Touro to Tulane to qualify as malpractice, it is essential that there be a health care provider-patient relationship between Tou-ro and Mr. Patín. This relationship is a sine qua non for malpractice to exist. Thus, we must determine whether Mr. Pa-tín was a “patient” of Touro, and whether Touro provided “health care” to Mr. Patín.
It is undisputed that Touro Infirmary is a licensed qualified health care provider under the MMA. However, this licensed status acts as a shield against suit in tort only when there is a health care provider-patient relationship. When there is no health care provider-patient relationship, the status of being licensed does not act as shield for actions that harm others.
The MMA defines “patient” as follows: (3) “Patient” means a natural person who receives or should have received health care from a licensed health care provider, under a contract, express or implied.
La. R.S. 40:1299.41 A
It is undisputed that Mr. Patín was a patient of Tulane Medical Center. It is also undisputed that Mr. Patín never had any express contract with Touro Infirmary.
Touro argues that it had an implicit contract with Mr. Patín because, as it alleges, Tulane sought blood from Touro on behalf of Mr. Patín. Touro argues that an implicit contract arose between Mr. Patín and itself because Tulane, allegedly, |4was acting solely on behalf of Mr. Patín when it put out a call for blood, to which Touro responded. Nowhere in the record do we find support for the allegations that Touro acted on behalf of Mr. Patín.
Touro cites cases from Minnesota and Indiana in support of its argument. That argument assumes, though, that Louisiana’s MMA defines a physician-patient relationship the same as that of Indiana and Minnesota. However Minnesota and Indiana, hinge their definition of a consensual physician-patient relationship on a physician’s motive. There, if a physician says he was contracting for a patient’s benefit, then that is what the courts accept as occurring:
[A] consensual relationship between a physician and a patient may exist where others have contracted with the physician on the patient’s behalf. *** The important fact in determining *819 whether the relationship is a consensual one *** is not who contracted for the service but whether it was contracted for with the express or implied consent of the patient or for his benefit. *** [Emphasis added.]
Walters v. Rinker, 520 N.E.2d 468, 472 (1988).
Nowhere in Louisiana’s statute does malpractice hinge upon what a treating physician construes he is doing by interacting with another licensed health care provider. Rather, Louisiana’s statute defines malpractice as occurring within the context of a health care provider-patient relationship. Without this health care provider-patient relationship, malpractice does not occur.
Another fact that distinguishes this case from the Minnesota and Indiana cases is that those cases dealt with an individual physician’s judgment having some extenuated contact through other persons to a patient. In this case there was no medical judgment being exercised, Touro was performing an administrative or commercial function of distributing a product, in this case blood.
|sNo medical judgment is involved in fulfilling a call for a certain product. The only judgment involved in the transaction between Touro and Tulane is that of the marketplace, i.e. supply and demand. In this case Touro performed the function of a distributor and did nothing that required any medical expertise vis-a-vis Mr. Patin. Thus, there was no “health care” provided to Mr. Patin by Touro.
In Hebert v. Federal Express Corp., 96-2684 (La.App. 4 Cir. 5/21/97), 695 So.2d 528, 531, writ denied, 97-1662 (La.10/10/97), 703 So.2d 606, this court cited Sewell v. Doctors Hospital, 91-CC-1668 (La.5/26/92) 600 So.2d 577, 579, in which the Supreme Court indicated that the following facts are appropriate in determining whether a particular alleged act falls within the purview of the Louisiana Medical Malpractice Act:
(1) “whether the particular wrong is ‘treatment related’ or caused by a dereliction of professional skill;”
(2) “whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached,” and
(3) “whether the pertinent act or omission involved assessment of the patient’s condition.”
Applying these factors to our facts it is clear that the shipment of contaminated blood is not caused by a dereliction of professional skill, it is a ministerial or clerical function and does not require any specialized training or knowledge. Nor does the distribution of contaminated blood require expert medical evidence to determine whether the standard of care was breached. Moreover, the standard of care for the distribution of contaminated blood is a standard of care found in tort, that of a reasonable person. Finally, the shipment of Ifithis contaminated blood had nothing to do with any assessment of Mr. Patin’s condition.
In sum, this set of facts does not fall under the MMA. Thus, Mr. Patin’s rights in tort are not limited and we reverse the finding of the trial court.
REVERSED.